Clarice Alforth Glennon, Appellant, v. Richard J. Glennon, Appellee.

Gen. No. 40,072.

14

16

Opinion filed February 14, 1939.

Daniel A. Wolf, of Chicago, for appellant.

Elmer M. Walsh, of Chicago, for appellee.

Mr. Presiding Justice Burke delivered the opinion of the court.

This appeal, by plaintiff, attacks portions of a separate maintenance decree entered in the circuit court of Cook county on January 5, 1938. The complaint was filed on May 21, 1936, and the pertinent allegations thereof are that the parties were married at Chicago on October 29, 1927; that they cohabited as husband and wife until January 31, 1936; that no children were born of the marriage; that on January 31, 1936, defendant left and absented himself from plaintiff, who was without fault; that at the time of the filing of the complaint she was living separate and apart from him; that he was guilty of adultery; that on certain days he punched and struck plaintiff; that defendant was the owner of stocks and bonds of considerable value; that in his employment he earned $279 monthly; that plaintiff gave to defendant $2,000, "which were her separate earnings"; that she helped pay the household expenses; that because of the conduct of defendant she suffered a nervous breakdown; that he threatened to sell his personal property, and she prayed that he be compelled "to make proper and suitable provision for the separate maintenance and support of the plaintiff according to the Statute in such case made

and provided; that the Court may make suitable allowances to the plaintiff for her necessary expenses of conducting this suit, including solicitor fees and for her support and maintenance during the pendency of this suit; and that this defendant be enjoined by the Order of this Court, without notice or bond, from selling, assigning, encumbering, transferring his stocks and bonds, enjoined from entering his vault, selling and disposing of the defendant's, Richard J. Glennon's 1935 Oldsmobile or otherwise disposing of the said property until the further hearing of this cause, and that the plaintiff may have such other and further relief in the premises as is just and meet.'' Defendant answered, admitting the separation but denying that plaintiff was without fault. He also severally denied the charges of cruelty and adultery; denied that he was the owner of stocks and bonds of great value; stated that he earned $220 per month; denied that plaintiff gave him $2,000; asserted that in 1933 plaintiff requested defendant to sell 50 shares of Montgomery Ward & Company stock valued at approximately $1,050 and to invest the proceeds in the stock market, and that he invested the money in stock agreed upon between them; that by virtue of the market falling the investment was wiped out; that plaintiff was not required to work; that he on divers occasions requested her to leave her employment in order to make a proper home for him, which she refused to do; denied that she suffered a nervous breakdown; stated that she was receiving a salary of $24.75 per week and that she was the owner of stocks and bonds of the value of $1,200, two diamond rings of the value of $750, and household furniture of the value of $650. An order for temporary alimony was entered. The cause was heard on March 18, 1937, when the chancellor entered an order reciting that the court ''having heard the evidence for the complainant and the defendant and having made a

finding for the complainant giving a Decree for Separate Maintenance on grounds of Desertion and associating with another woman. The question of income and other matters to be referred to Master Rentner to make a recommendation to the Court of his Findings of facts for the purpose of ascertaining the amount if any of alimony, solicitors fees, etc.'' The court having decided that plaintiff was entitled to separate maintenance the parties accepted that finding. Thereupon testimony was taken before the master, who found that ''there is no evidence in the record to show that the plaintiff is not able to properly support and maintain herself upon her present income of Twenty-four and 80/100 ($24.80) Dollars per week,'' and recommended that defendant be required to pay his wife the sum of $140, which was arrears in alimony, an additional sum of $75 for her solicitor's fees, and the sum of $31.95 advanced by plaintiff for the service of subpoenas. The master further recommended that no alimony be allowed to plaintiff. Plaintiff filed objections, which stood as exceptions. The chancellor overruled the exceptions, and on January 5, 1938, a decree was entered, which found that the defendant wilfully deserted and absented himself from the plaintiff without any reasonable cause, and with no fault on the part of the plaintiff, commencing on January 31, 1936. The decree approved the master's report, except that plaintiff's solicitor's fee was increased from $75 to $100, which, with the $50 previously allowed as temporary solicitor's fees gave plaintiff $150 for solicitors' fees. The decree also found that plaintiff was employed and earned $24.80 per week, that the income was ample for her support and maintenance and that she was not entitled to any further sums for permanent support. Further, the decree granted separate maintenance to the plaintiff; directed the payment of additional solicitor's fees and $140 which defendant was

in arrears in temporary alimony; directed that defendant pay to plaintiff $31.95 which plaintiff expended for subpoena fees, and that "Dr. Soldinger's claim for physician services rendered to plaintiff in the sum of $169.00 be reserved by this Court until the case entitled Joseph L. Soldinger vs. Richard J. Glennon, now pending in the Municipal Court of Chicago, Case #2295142, is disposed of."

On November 9, 1936, the chancellor gave defendant leave to withdraw his answer for the purpose of filing a motion to strike plaintiff's complaint. The grounds alleged by defendant for striking the complaint were "1. The Court is without jurisdiction to grant the relief prayed for in said Bill of Complaint and Petition. 2. Plaintiff seeks in said cause of action to have adjudication and finding of property rights, which can only be adjudicated in a Bill for Divorce." Before the chancellor and here both parties assume that plaintiff prayed for an adjudication of her property rights. The motion to strike the complaint was overruled and thereupon defendant filed an amended answer, which was substantially the same as the answer he had previously filed. The argument urged by defendant on the motion and the chancellor's reason for his ruling do not appear. However, in his briefs here defendant contends that under a strict construction of sec. 22, ch. 68, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 109.189], the court, in a separate maintenance suit, does not have jurisdiction to settle property rights. In support of his contention that the Separate Maintenance Act (sec. 22, ch. 68, Ill. Rev. Stat. 1937) does not mention nor grant power to settle property rights defendant cites *McAdams v. McAdams,* 267 Ill. App. 124. In *Decker v. Decker,* 279 Ill. 300, plaintiff asked a decree of separate maintenance, and the court said (p. 309):

"If the wife has no claim for separate maintenance or alimony except the existence of the marriage rela-

tion and the husband's fault, an allowance should be paid in money at stated intervals. If either or both have equitable rights in a piece of real estate or a chattel, other than through the marriage relation, by reason of their having purchased or contributed to the purchase or accumulation thereof, the court may decree equities to both in such property or award it to the one who purchased it outright or award other property in lieu thereof. (*Champion v. Myers*, 207 Ill. 308; *Robbins v. Robbins*, 101 id. 416; *Wilson v. Wilson*, 102 id. 297.) The sum and substance of the various holdings is that the wife shall not merely have what necessity demands but what complete justice requires, and that both the husband and the wife are first entitled to have their equities settled in the property held by both, jointly and separately." In *Harding v. Harding*, 144 Ill. 588, which was a bill for separate maintenance, the court, in speaking of the construction of the Separate Maintenance Act, said (p. 597):

"We are not disposed to give this remedial statute so narrow and restricted a construction. . . . The statute, recognizing the obligation of the husband, and the defect in the common law, gives to the wife a remedy in her own name, in equity, whenever she is living apart from her husband without fault on her part. The remedy is given in equity, and when the aid of that jurisdiction is properly invoked, it necessarily calls into activity all of the ordinary powers of the court necessary to render the remedy efficacious and complete. Upon bills for separate maintenance, as in divorce cases, the court is required to deal with the rights and duties of the parties, growing out of their marital relations, and in the jurisdiction to determine the causes, there necessarily exists the power to compel the doing of such acts by the parties as are necessary to effectuate the purpose for which the jurisdiction is conferred." In the *McAdams* case, *supra,* the court asserted (p. 133)

that in the *Decker* case the point that the court had no jurisdiction was not raised, and that, hence, the language was merely *obiter dictum*.

Defendant concedes that in a divorce case the plaintiff could seek a settlement of her property rights, but contends that under the holding in the *McAdams* case she cannot do so. In fact, it is defendant's position that "the plaintiff was seeking an adjudication of property rights, which relief was obtainable only by filing a Bill of Divorce." Manifestly that cannot be the law. Under that theory, if a woman did not wish a divorce, she could not have her property rights adjudicated. Such reasoning does not square with the provisions of sec. 19, art. II, of the State Constitution that "every person ought to find a certain remedy in the laws for all injuries and wrongs which he may receive in his person, property or reputation; he ought to obtain, by law, right and justice freely, and without being obliged to purchase it, completely and without denial, promptly, and without delay." The act entitled "Rights of Married Women" (ch. 68, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 64.01 *et seq.*]) provides (sec. 1) that a married woman may sue and be sued without joining her husband with her, to the same extent as if she were unmarried; (sec. 2) that if husband and wife are sued together the wife may defend for her own right; (sec. 6) that the wife may make contracts and incur liabilities to the same extent and in the same manner as if she were unmarried; (sec. 7) that a married woman may receive, use and possess her own earnings, and sue for the same in her own name, free from the interference of her husband or his creditors; (sec. 9) that a married woman may own in her own right, real and personal property obtained by descent, gift or purchase, and manage, sell and convey the same to the same extent and in the same manner that the husband can property belonging to him;

and (sec. 10) that "should either the husband or the wife unlawfully obtain or retain possession or control of property belonging to the other, either before or after marriage, the owner of the property may maintain an action therefor, or for any right growing out of the same, in the same manner and to the same extent as if they were unmarried." It is apparent that a wife may maintain an appropriate action against her husband, at law or in equity, depending on the factual situation, the same as if she were an unmarried woman, and even while the marriage relation subsists she may maintain an action against her husband. In *Larison v. Larison*, 9 Ill. App. 27, the wife filed a bill in equity against her husband, setting out that by virtue of certain contracts between them she was the owner of certain property in Bloomington, known as "The Larison Dray Line"; that by arrangement between them she was to employ her husband so long as he abstained from the use of intoxicating liquors, improper intimacy with women, and to pay her all moneys coming into his hands. She asked that he be enjoined from interfering with her in the conduct of the business, and a temporary injunction was granted restraining him from in any way interfering with the management, control and ownership of the property. A demurrer was filed averring as special cause that plaintiff had an adequate remedy at law. The demurrer was overruled, whereupon defendant answered, and upon hearing the chancellor decreed that the temporary injunction be made perpetual. The Supreme Court held that the bill did not show that the injury committed or threatened was irreparable, that it failed to aver the insolvency of the husband, and that (pp. 31, 32):

". . . no reason is perceived why adequate damages may not be recovered at law. Mere allegations of danger or of great and irreparable injury are not

sufficient. Facts must be stated to satisfy the court of such danger. . . . There must be something particular or special in the case for which a court of law cannot afford adequate redress. . . . The 10th section of the act of 1874, Rev. Stat. 1880, page 592, provides that 'should either the husband or wife unlawfully obtain or retain the possession or control of property belonging to the other, either before or after marriage, the owner of the property may maintain an action therefor, or for any right growing out of the same, in the same manner and to the same extent as if they were unmarried.'

"It is a well settled rule of law that where a new remedy is given by statute it does not take away the existing remedy unless the statute expressly so provides; and it is insisted by defendant in error that as the remedy for an injury to the property of a married woman by her husband was in equity . . ., this section is to be treated as cumulative, and as giving a new remedy without taking away the old.

"Had the rights of the parties remained the same as they were at common law, such would have been the correct construction of this section; but this statute does more than give a new remedy—it changes the entire rights of the parties, it removes the disability of marriage and creates the wife a *feme sole* for the purpose of acquiring, managing and disposing of property; of contracting and being contracted with; confers upon her the legal title to her property, recognizes her separate existence, and gives her a legal standing in the courts of law, which she did not before possess, and these new rights must be enforced in a court of law, the same as if she were a *feme sole*.

"This controversy is between the parties to this suit. The rights of creditors are not involved, and in the transfer of property from Larison to his wife there is no pretense of cover for fraud.

"Her right to the property is a naked, legal right, and a court of law is fully adequate to its protection. Under such circumstances, the use and enjoyment of the property between husband and wife, while residing together as such, is not the proper subject for the interference of a court of chancery, unless to prevent irreparable injury." Hence, even before the Civil Practice Act went into effect a wife could sue her husband in chancery and sustain her bill if she was able to aver and prove ground for equitable relief; and, likewise, in an appropriate case she could maintain an action against him at law. She may maintain an action at law or in chancery to adjudicate her property rights, and therefore the question arises whether under the Civil Practice Act she may join an action the purpose of which is to adjudicate her property rights with an action for separate maintenance. Section 4 of the Civil Practice Act (sec. 128, ch. 110, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 104.004]) provides: "This Act shall be liberally construed, to the end that controversies may be speedily and finally determined according to the substantive rights of the parties, and the rule that statutes in derogation of the common law must be strictly construed shall not apply to this Act or to the rules made pursuant thereto." Sections 21 to 30, inclusive (secs. 145 to 154, inclusive, ch. 110, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 104.021–104.030]), contain liberal provisions with respect to joining parties plaintiff and parties defendant. No discussion of these sections is necessary as in this case there is only one person on each side. Section 31, (1) (sec. 155, ch. 110, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 104.031]), provides that there shall be no distinctions respecting the manner of pleading between such actions at law and suits in equity, other than those specified in the act and the rules adopted pursuant thereto; section 33, (3) (sec. 157, ch. 110, Ill. Rev.

Stat. 1937 [Jones Ill. Stats. Ann. 104.033]), that pleadings shall be liberally construed with a view to doing substantial justice between the parties; section 43, (1) (sec. 167, ch. 110, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 104.043]), that parties may plead as many causes of action, counterclaims, defenses, and matters in reply or rejoinder as they may have, and each shall be separately designated and numbered, and (2), that when a party is in doubt as to which of two or more statements of fact is true he may state them in the alternative. Section 44 (sec. 168, ch. 110, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 104.044]) provides: "(1) Subject to rules any plaintiff or plaintiffs may join any causes of action, whether legal or equitable or both, against any defendant or defendants. . . . But the court may, in its discretion, order separate trials of any such causes of action . . . if they cannot be conveniently disposed of with the other issues in the case. Legal and equitable issues may be tried together where no jury is employed. (2) Any cause of action or counterclaim may be transferred at any time, by order of the court, from the law docket to the equity docket, or vice versa, as convenience and the nature of such action or counterclaim may require, and when so transferred shall proceed as though commenced on the proper side of the court; and any issue may at any time, by order of the court, be transferred for trial to the proper side of the court." Rules 10 and 11 of the Rules of Practice and Procedure adopted by the Supreme Court (secs. 259.10 and 259.11, ch. 110, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 105.10, 105.11]) read: "10. Issues Cognizable By Court of Equity. All matters which, prior to January 1, 1934 were within the jurisdiction of a court of equity, whether directly or as an incident to other matters before it or which the equity court could have heard so as to do complete justice between the parties, may here-

after be regarded as a single equitable cause of action, and when so treated as a single cause of action shall be pleaded without being set forth in separate counts and without the use of the term 'count' in such pleading; and shall be heard and decided in the manner heretofore practiced in courts of equity. 11. Pleading of Equitable Matters. When actions in law and in chancery which may be prosecuted separately are joined, the party joining such actions may, if he desires to treat them as separate causes of action, plead such causes of action in distinct counts, marked respectively 'separate action at law' and 'separate action in chancery.' When so pleaded the court shall first determine whether the actions joined by the separate counts are properly severable, and, if so, whether the actions shall be tried separately and in what order, or whether the actions shall be tried together. If the court determines that the actions are severable, the issues formed on the legal counts shall be tried before a jury when a jury has been properly demanded, or by the court when a jury has not been properly demanded, and the equitable issues shall be heard and decided in the manner heretofore practiced in courts of equity. . . . ''

Under the liberal provisions of the Civil Practice Act and the rules adopted by the Supreme Court, a wife or husband who seeks separate maintenance may have her or his property rights adjudicated in the same action. When necessary the complaint may have separate counts in equity and in law, and may state the facts in the alternative. Section 43, (2) (sec. 167, ch. 110, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 104.043]), provides that a bad alternative shall not affect a good one. The court may, in its discretion, order separate trials of any causes of action if they cannot be conveniently disposed of with the other issues in the case, and may transfer any cause of action from the law to the chancery docket, or *vice versa*.

Before the master plaintiff testified that she was employed as a supervisor for Montgomery Ward & Company prior to her marriage and continued in such employment during the marriage, receiving $24.80 per week; that she was so employed for 18 or 19 years; that she was employed at the time of the hearing; that she put the cash from her salary in a steel box at their home; that a joint account was opened in the First Union Trust and Savings Bank; that her husband drew out $400 from the joint account on October 18, 1933, and an additional $400 on October 23, 1933, which he placed in a stock account that he carried with Hornblower & Weeks; that she did not draw anything out of the joint account; that she possessed 50 shares of stock of Montgomery Ward & Company which she acquired through her separate earnings under a company savings plan; that on October 28, 1931, she drew $160 from her Montgomery Ward & Company account and gave it to her husband; that all through their married life she loaned money to her husband; that he applied the money loaned on stocks; that she did not keep a record of the money loaned; that in July, 1933, she turned over to her husband the 50 shares of Montgomery Ward & Company stock which she owned, which, together with her share of the money that he had withdrawn from the bank account, was valued at $2,000; that the separation occurred January 31, 1936; that she continued to reside in the apartment where both had been living until April 30, 1936; that she then moved in with her mother; that she gave some of their furniture to her niece and that some of it she still possessed; that the furniture was badly worn, having been in use in their apartment for eight and one-half years; that her husband spent about $300 in the purchase of furniture; that some of the furniture came in the way of gifts; that she did not then possess a bank account nor a safety deposit box; that there was a stock

account in her name with Babcock, Rushton & Co. which on May 4, 1936, prior to the filing of the complaint, was transferred to her sister, Florence Alforth; that at the time of the filing of the bill there was a credit in that stock account of $976.22; that the stock was not originally hers and was not purchased with her money, but in reality belonged to her sister; that witness was buying and selling for her sister, who was employed in the State auditor's office at Springfield; that witness had no interest in the account; that when the account was transferred (May 4, 1936) witness received $275; that in 1933 defendant asked her if she would place her 50 shares of Montgomery Ward & Company stock as collateral in his account with Hornblower & Weeks; that he informed her that if she did not do so he would lose everything he had; that she told him that he could not sell the stock; that it was only placed as collateral and that he would return the stock to her; that he "never informed me that the stock was sold"; that when she inquired about the stock he would tell her that the stock was still there and that she had nothing to worry about; that at the time of the "crash" he told her there was $5,000 left; that she knew he borrowed money on his life insurance policy and that the money obtained from the loan, approximately $275, was applied on his brokerage account; that she later learned that her stock was sold by the brokers and $1,006.25 was credited to his account; that she owns two diamond rings which her husband gave to her when they were engaged. Defendant testified that in addition to paying the rent, insurance premium, telephone and electric light and milk bills he gave his wife an average of $50 a month; that "I gave my wife money to run the house by the hundreds, and food"; that in the early part of their married life they pooled their earnings; that "after we got so much money we put it in the bank"; that he kept her "very well clothed";

that "in the early part of our married life we worked together because we practically started out with nothing and wanted to build up a savings account. After that we got into the stock market"; that he spent approximately $600 for the purchase of furniture, none of which he retained; that in the summer of 1933 the stock market was sliding down and he was "putting everything I had into it. . . . I couldn't borrow any more money. I borrowed on my life insurance policy $275. I put that in. And when there was no other place to borrow she told me she was going to put her fifty shares of Montgomery Ward stock in there"; that at that time he had a conversation with her in which he said that he wished to cancel out the account and salvage what he could; that she resisted him in that wish. He denied that he received $800 in cash from his wife. He stated that his stock account was at one time worth $11,000 but at the time when the account was sold out there was $600 left to his credit; that he owes $400 on his life insurance policy; that he pays $50 a month toward the support of his mother; that he owes his attorneys; that he has a brokerage account with Hornblower & Weeks worth $1,200; that his salary is $231.26 per month, out of which $11.44 is paid for an employees' annuity fund; that he receives $75 a month additional for maintenance of his automobile. Plaintiff, in rebuttal, stated that while the parties lived together they visited defendant's mother about once a month and on each occasion defendant gave his mother 5 dollars. Various exhibits, consisting of ledger sheets from the brokers, and the deposit book, were introduced in evidence. It was stipulated that if Dr. Joseph L. Soldinger appeared as a witness he would testify that he performed certain medical services for plaintiff and that his charge therefor was $169, which remains unpaid, and that a suit is pending in the municipal court of Chicago against plaintiff and

defendant to recover therefor; that defendant has denied the services were rendered or that they are reasonably worth such sum, and a jury trial has been demanded therein. Florence Alforth, a sister of plaintiff, testified that she is employed in the office of the State auditor at Springfield and that the account in the name of plaintiff on the books of Babcock, Rushton & Company was in reality witness's account; that she forwarded, through the mail, in cash, sums of money to her sister, which her sister deposited, and that the account was changed on the books so as to show in her name, on May 4, 1936, which was shortly before the complaint was filed.

Plaintiff complains of the clause in the decree finding that the $24.80 per week which plaintiff earns is ample for her support and maintenance and that she is not entitled to an order for any permanent support. On its face the clause is inconsistent with the provision "that a decree for Separate Maintenance be and is granted the plaintiff, Clarice Alforth Glennon, from the defendant, Richard J. Glennon, on the ground of desertion, the defendant having wilfully deserted and absented himself without cause and no fault on the part of the plaintiff." The decree purports to give separate maintenance to plaintiff and yet in the succeeding paragraph contradicts the provision by stating that plaintiff is not entitled to any permanent support. At the time the complaint was filed the parties were living separate and apart and if plaintiff was not entitled to any support money there was no need of a decree granting "separate maintenance." The Separate Maintenance Act (sec. 22, ch. 68, Ill. Rev. Stat. 1937 [Jones Ill. Stats. Ann. 109.189]) provides that a woman who without fault on her part lives separate and apart from her husband may have her remedy in equity for a reasonable support and maintenance while they so live separate and apart. A favorable decree

in a separate maintenance case merely finds the fact that the plaintiff is living separate and apart from her husband without fault on her part, and because of such finding awards reasonable support to her "while they live separate and apart." The chief object, therefore, is to give reasonable support and maintenance where the court finds that the plaintiff is living separate and apart without any fault on her part. It was defendant's contention that he paid all the expenses incurred and gave his wife "money to run the house by the hundreds, and food." While no hard and fast rule can be laid down for the determination of alimony, it has been held that where both parties have an income the method of computation of a proper allowance for the wife's support and maintenance is to add the wife's annual income to her husband's, consider what, under all the circumstances, should be allowed her out of the aggregate, and then from the sum so determined deduct her separate income, and the remainder will be her proper annual allowance. (*Harding v. Harding, supra; Decker v. Decker, supra.*) We are of the opinion that the court should find what reasonable sum is required for the support and maintenance of plaintiff, and if such sum is not adequate defendant should be required to pay such reasonable support money, if any, as the circumstances disclosed by the evidence may warrant.

Plaintiff complains that the allowance to her for solicitor's fees was too low. She was given a total of $150 for temporary and permanent solicitor's fees. While the actual time that plaintiff's solicitor spent on this case does not appear, an examination of the record discloses that he appeared in court and before the master on numerous occasions. In view of the income of the defendant and the great amount of time which plaintiff's solicitor necessarily spent, the sum of $150 is manifestly inadequate. The court refused to allow

plaintiff the sum of $250 that she expended for the services of investigators. We cannot say that the failure to allow this sum was an abuse of discretion. The chancellor found for defendant on plaintiff's claim that she gave him $800 out of their joint bank account, and we find that the ruling is supported by the evidence.

The court reserved for future consideration the payment of a physician's bill in the sum of $169. It appears that the cause wherein the physician is suing both parties is pending on the jury calendar in the municipal court of Chicago. If the services were rendered and the charge is reasonable, we do not see any good reason why defendant should not pay the same. However, plaintiff is not harmed by the provision reserving the question until the case in the municipal court is disposed of. If the physician does not prevail in his action she is not harmed. If he does prevail the decree should require the husband to pay the judgment.

Plaintiff contended that she delivered to defendant the 50 shares of Montgomery Ward & Company stock in order that he could use the same as additional collateral in his brokerage account. She stated that when she inquired as to the status of the same he told her that the stock was still on deposit with the brokers. Defendant testified that the stocks were going down; that he "couldn't borrow any more money. I borrowed on my life insurance policy $275. I put that in. And when there was no other place to borrow she told me she was going to put her fifty shares of Montgomery Ward stock in there." Defendant contends that by plaintiff's action in depositing the 50 shares of stock with his broker she invested with him and took her chances on the market. However, the brokerage account remained in the husband's name. His testimony before the master was at variance with the statement in his answer. In the latter he said his wife told him

to sell the 50 shares and invest the proceeds in the stock market, and that he did invest the proceeds in stock agreed upon between them. It appears that when all the stocks in his brokerage account were sold there was $600 left, which defendant retained. The master did not report any finding as to the 50 shares of stock. The objections filed by plaintiff, which stood as exceptions, pointed out the omission of any finding on this issue. The decree overruled all the exceptions (other than giving plaintiff additional solicitor's fees) and did not otherwise pass on plaintiff's contention that she had a right to have the 50 shares of stock restored to her, or, in the alternative, a judgment against defendant for the sum of $1,006.25, being the amount derived from the sale of the stock. We are of the opinion that on appropriate pleadings the property rights of the parties may be determined in the instant cause. Therefore the issues may be determined by the court, without a jury, regardless of whether they present legal or equitable problems for solution. The court should rule on plaintiff's contention as to her property rights. When further proceedings are taken in this case either party will have the right to introduce any additional competent testimony which he or she may regard as material to his or her contention.

For the reasons stated the decree of the circuit court of Cook county is reversed, and the cause remanded, with directions that such further proceedings be had as are not inconsistent with this opinion.

*Decree reversed, and cause remanded, with directions.*

JOHN J. SULLIVAN and FRIEND, JJ., concur.